HEARD APRIL TERM, 1878.

## SIMONS *vs.* BRYCE.

A bequest as follows: "To my son C., (with the above requisitions and reservations,) and to his children, the lawful heirs of his body, I give and bequeath all the rest and residue of my estate, real and personal, * * * to him and to his children forever; and I wish it fully understood * * * that, in the event of his dying leaving a wife, his widow shall not be entitled to any part or portion of my estate which I am now disposing of, but that it shall be the property of all his children, share and share alike, to be enjoyed and managed and controlled by him during his lifetime for his and their use and benefit * * * ; and that in the event of his outliving his children and dying childless, without grandchildren, the lawful issue of his loins, then the estate which I now have shall go to the children of my brothers, P. and R., and their children:" *Held,* That the son, C., took in the personalty an estate for life, with remainder to his children or heirs of his body living at the time of his death, and, for want of such issue, then to the children of P. and R.

An executrix, who is also a devisee of the testator and in possession of the lands devised to her, cannot execute a valid mortgage of her estate in such lands, to secure the payment of her own debt, until the debts of the testator have been paid.

A mortgage given by a devisee in possession is not an alienation, within the meaning of the statute 3 and 4 W. & M., Ch. IV.

BEFORE CARPENTER, J., AT RICHLAND, MAY, 1877.

This was an action by Margaret C. Simons and others against Sarah M. Bryce and John C. Bryce, executors of Campbell R. Bryce, deceased, and George W. Williams and others.

The case will be understood from the decree of the Circuit Court and the opinion of this Court.

The decree of the Circuit Court is as follows:

CARPENTER, J. This action is brought by the children of Campbell R. Bryce, deceased, claiming to be the devisees and· legatees, in remainder, under the will of John Bryce, the father of Campbell R., against the executors of the will of the said Campbell R. Bryce, and the judgment creditors of the said Sarah M. Bryce, and the Sheriff and Coroner of Richland County.

The objects of the action are—

*First.* An injunction to restrain the creditors of the said Sarah M. Bryce from selling lands devised by Campbell R. Bryce to Sarah M. Bryce, under a decree of foreclosure rendered against the said Sarah M. Bryce.

*Second.* For judgment against the executors of Campbell R. Bryce upon certain instruments of writing executed by the said Campbell R. Bryce and hereinafter set forth; and to subject the lands devised to the said Sarah M. Bryce by the said Campbell R. Bryce, and by her mortgaged to the defendants, to the payment of such judgment as they may recover against the said executors.

The answer of Jesse E. Dent, "The Mechanics' and Farmers' Building and Loan Association of Richland County, South Carolina," and George W. Williams embraces the following defenses:

1. That, under the will of John Bryce, Campbell R. Bryce took an estate in fee conditional in the lands devised, and consequently an absolute estate in the personalty.

2. That, even upon the assumption that Campbell R. Bryce took not a life estate, with remainder to his children, in the property devised and bequeathed to him by the said John Bryce, yet, the said Campbell R. Bryce having devised his lands to the defendant, Sarah M. Bryce, who entered upon and possessed herself of said lands, and afterwards, before suit brought against her by any creditors of Campbell R. Bryce, *bona fide* conveyed said lands, by way of mortgage, to the said defendants, the creditors of Campbell R. Bryce are, by the terms of Sections 5 and 7 of Chapter XIV, 3 and 4 William and Mary, (2 Stats., 534,) precluded from enforcing their claims against the said lands and are remitted to their personal action against the devisee.

3. That the plaintiffs are estopped by their release under seal, and by their knowledge of and implied assent to the terms of that release, from asserting any claim on account of the written instruments set forth in the complaint as a cause of action.

4. That the plaintiffs are barred by the Statutes of Limitations from enforcing the said claims against the executors of Campbell R. Bryce.

5. That, as between the parties to this action, the devise by Campbell R. Bryce to Sarah M. Bryce was the fulfillment of an obligation upon good consideration, created by the terms of the will of John Bryce.

6. That the plaintiffs are barred from enforcing their said claims as against the said defendants, who are "*bona fide*" creditors without notice, by reason of their knowledge and concealment of the fraud perpetrated by the defendant, Sarah M. Bryce, in mortgaging the said property without disclosing the existence of the said claims.

The facts involved in the case are as follows:

1. John Bryce, by his last will and testament, bearing date May 7, 1851, made, *inter alia*, the following devises and bequests, that is to say: "To my son, Campbell R. Bryce, (with the above requisitions and reservations,) and to his children, the lawful heirs of his body, I give and bequeath all the rest and residue of my estate, real and personal, of whatever kind I may die seized and possessed of, or that may at any time hereafter, either before or after my death, become mine, to him and to his children forever. And I wish it fully understood and declared, that, having already given him about sixty thousand dollars at various times, and he being worth a property of his own at this present time of fully that amount clear of debt, that, in the event of his dying leaving a wife, his widow shall not be entitled to any part or portion of my estate which I am now disposing of, but that it shall be the property of all his children, share and share alike, to be enjoyed and managed and controlled by him during his lifetime for his and their use and benefit. And this is not intended to apply to the present wife only, who is a most excellent lady and faithful and loving wife and mother, but also to any future wife. And I furthermore intend and desire, that, in the event of his outliving his children and dying childless, without grandchildren, the lawful issue of his loins, then the estate which I now have shall go to the children of my brothers, Peter and Robert Bryce." Lastly, "I do hereby appoint, nominate and constitute my beloved son, Campbell Robert Bryce, in whose principles and honor I have the highest confidence, sole executor of this my last will and testament; and I hereby clothe and endow him with full power and authority to take all my estate, real and

personal, wherever it may be, and of whatever it may consist, into his possession, and to pay off my debts at as early date as he conveniently may; to discharge and pay off, as I have herein rehearsed, all the bequests and legacies; and he, in the performance and discharge of this trust and duty, is at full liberty to sell and dispose of any portion of my estate, excepting such portions as I have disposed of by this instrument, without application to any Courts of law, or making returns or accounts to any Ordinary, Chancellor or Commissioner. All I require is, that this instrument may be placed on record, that all who have any rights under it may know what they are. I have no fears that my son will fail to carry out my intentions."

2. John Bryce died on the 24th day of November, 1855, at which time Campbell R. Bryce had children, but no grandchildren.

3. Campbell R. Bryce qualified as executor of his father's will and administered the estate.

4. In his account as executor, he charged himself on August 10th, 1859, with the sum of $2,000, and simultaneously executed a paper, of which the following is a copy:

"AUGUST 10th, 1859.

"$2,000. Due the estate of John Bryce two thousand dollars, for so much of its money this day taken in loan, for my personal use.

"Witness my hand and seal.

"CAMPBELL R. BRYCE, [L. S.]"

5. On the 4th day of April, 1863, he charged himself with $27,390.16, as the proceeds of the sale of certain shares of the capital stock of certain of the banks of the State, belonging to his testator's estate, and at the same time executed the two papers of which the following are copies:

"COLUMBIA, S. C., April 4th, 1863.

"$13,695.08. On or before the first day of July next, I promise to pay to the estate of John Bryce thirteen thousand six hundred and ninety-five 08-100 dollars for value received.

"Witness my hand and seal.

"CAMPBELL R. BRYCE, [L. S.]"

"COLUMBIA, S. C., April 4th, 1863.

"$13,695.08. On or before the first day of January next, I promise to pay to the estate of John Bryce thirteen thousand six hundred and ninety-five 08-100 dollars for value received.

"Witness my hand and seal.

"CAMPBELL R. BRYCE, [L. S.]"

The amounts of the two papers aggregating the precise sum on the same day charged in his account.

6. The said Campbell R. Bryce, on the          day of          , 1863, executed his last will and testament, wherein and whereby he devised and bequeathed as follows: "I devise and bequeath to my beloved wife, Sarah M. Bryce, absolutely and forever, all my estate, real and personal, which I owned before my father's death, or have since acquired, and which I did not derive under the devises and bequests of his will; that is to say, I devise and bequeath to her my dwelling house and lot in Columbia, containing two acres of land, together with my furniture, books, horses and carriage, silver plate, and all things at and belonging to said establishment; also my plantation situate about six miles below Columbia, on the Bluff road, containing one thousand three hundred and thirty-four acres, with all the fixtures and machinery thereon; all my stock, horses, mules, hogs, wagons and plantation implements and growing crops thereon; also the following negroes, with their issue; * * * * also, I devise and bequeath to my beloved children, born or to be born, all my estate, real and personal, which I derived or which may come to me under the will of my beloved and honored father, to be equally divided between them; the issue of any child who may die before me to take the parent's share;" * * * * and appointed his mother, Sarah F. Bryce, his wife, Sarah M. Bryce, and his son, John C. Bryce, executors, and died on the 14th day of August, 1867, leaving his will of force.

7. The will was admitted to probate on the          day of          , 1867, and the executors therein named all duly qualified therein, and assumed the administration of the estate, but that the said estate has not yet been fully administered.

8. Mrs. Sarah F. Bryce departed this life on the 21st day of May, 1870, leaving the said Sarah M. Bryce and John C. Bryce surviving executors.

9. At the time of the death of Campbell R. Bryce, all of his children had attained the age of twenty-one years, except Elizabeth

H., now the wife of the plaintiff, Carl McKinley, and Mary Y. Bryce, who attained that age, respectively, on the          day of December, 1871, and on the          day of November, 1874, and Nina R. Bryce and Florence M. Bryce, who are still infants, and are now of the ages of seventeen (17) and thirteen (13) years, respectively.

10. That on the          day of          , 1868, the following paper was executed by the parties whose signatures are thereto appended:

"SOUTH CAROLINA, )
    RICHLAND COUNTY.  }

"Whereas the undersigned, the residuary legatees and devisees under the last will and testament of John Bryce, deceased, have learned that our mother, Sarah M. Bryce, found amongst the papers of our late father, Campbell R. Bryce, two certain papers, said to be in the handwriting of our said father, of which the following are copies:" [Here are inserted copies of the two notes set forth in the 5th finding of fact.] "And whereas it has been ascertained to our satisfaction that if said papers were intended by our father as acknowledgments of indebtedness, they were acknowledgments of indebtedness in Confederate currency only, at that time greatly depreciated and now utterly worthless; also, that such Confederate currency was the proceeds of sale of bank or other stock, which, had it been retained by our father, would soon be worthless, and perhaps worse than worthless, because of the supposed liability attending the ownership thereof; and whereas we are satisfied if said papers were really acknowledgments of money received by our father for the estate of his father, and if the same, or any part thereof, was used by our said father, the same, or the larger portion thereof, was used in the support, maintenance and education of ourselves and the other members of his family; and whereas if said papers do constitute valid claims against the estate of our father, and should now be enforced against it, such has been the loss and destruction of both estates, and so great have been the changes in the condition of both, that we are satisfied our mother, Mrs. Sarah M. Bryce, might, and probably would, be deprived of the maintenance and support which we are well assured both our father and grandfather intended she should have out of their estates:

"Now, therefore, know all men by these presents, that we, the undersigned residuary devisees and legatees under the last will and

testament of the said John Bryce, for the consideration aforesaid, and for the further consideration of five dollars to us paid by our mother, Mrs. Sarah M. Bryce, at or before the sealing and signing of these presents, do hereby release, relinquish, assign and transfer unto the said Sarah M. Bryce all our right, claim, interest or demand, and all and every supposed right, claim, interest or demand, against or upon the estate of the said Campbell R. Bryce, under the said last will and testament of the said John Bryce, deceased, or in any other character or capacity whatever, on account of the said two papers above copied, or on account of any sum or sums of money of the receipts of which the said papers may have been acknowledgments. This release and relinquishment to embrace not only the principal sum supposed to be or actually represented by said papers, but also all accumulations of interest thereon. In this release or extinguishment of claim upon the estate of the said Campbell R. Bryce, each of the undersigned acts for him or herself alone, and as to his or her interest or share, or supposed interest or share, and for no other person or persons.

"In witness whereof we have hereunto set our hands and affixed our seals, this                 day of                 , 1868.

|                         |         |
|-------------------------|---------|
| "SARAH BRYCE,           | [SEAL.] |
| "JOHN C. BRYCE,         | [SEAL.] |
| "M. C. SIMONS,          | [SEAL.] |
| "E. H. BRYCE,           | [SEAL.] |
| "M. Y. BRYCE,           | [SEAL.] |
| "W. A. CLARKSON,        | [SEAL.] |
| "SALLY C. CLARKSON.     | [SEAL.] |

"Signed and sealed and delivered in the presence of
   "GEO. HOWE,
   "SAM'L FAIR,
   "J. J. GOODWIN,
   "C. T. GOODWIN."

11. On the death of her husband, the defendant, Sarah M. Bryce, entered as devisee upon the lands and premises devised to her, and has ever since continued in the possession and enjoyment thereof, treating them as her own property.

12. The defendant, Sarah M. Bryce, retained the three papers above recited, and signed by her testator, Campbell R. Bryce, in her own actual possession until the year 1870, when she deposited

them, in a mass of papers pertaining to her testator's estate, in the office of her attorney, Major C. D. Melton, since deceased, where they remained until some time in the early part of the year 1876, when, at her request, Mr. Clark, who had become the partner of Mr. Melton, searched for and found them among the papers of the estate. It does not appear that Mr. Melton, during his life, even knew of the existence of said papers; and it appears from the testimony of Mr. Clark that *he* had never seen or heard of them until he instituted the search for them as above stated.

13. That on the 18th day of October, 1876, Carl McKinley was duly appointed the general guardian of the infant plaintiffs, Nina R. and Florence M. Bryce, when the said papers were placed in his hands by the said Sarah M. Bryce, and by him delivered to Edward R. Arthur, Esq., attorney for the plaintiffs, for the purposes of this suit.

14. The existence of the three notes and the release above recited was always known to the several members of the family of Campbell R. Bryce, deceased, and at no time before the commencement of this action was any claim to the said notes set up, or any objection to the said release urged by any one of the parties.

15. That on the 27th day of March, 1874, the defendant, Sarah M. Bryce, executed and delivered to the defendant, Jesse E. Dent, a mortgage of the house and lot in the city of Columbia described in the pleadings, being a parcel of the land and premises devised to her by her deceased husband, Campbell R. Bryce, to secure the payment of a bond for two thousand dollars ($2,000) borrowed money; and on the 14th day of May, 1874, the said Sarah M. Bryce executed and delivered to "The Farmers' and Mechanics' Building and Loan Association of Richland County, South Carolina," a mortgage of the plantation described in the pleadings, also a parcel of the said devised lands and premises, to secure the payment of a bond for the sum of        dollars, ($     ,) borrowed money; and also, on the 3d day of May, 1875, the said defendant, Sarah M. Bryce, executed and delivered to George W. Williams a second mortgage of the plantation above described, to secure the payment of a bond for the sum of        dollars, ($     ,) borrowed money.

16. It appears that the negotiation of these several loans, and the execution of the several mortgages, was known generally in the family of the said Sarah M. Bryce. Several of her daughters ac-

companied her in frequent visits to the office of Messrs. Melton & Clark, where the negotiation of the loan from Jesse E. Dent, and the security to be given to him, was the topic of conversation.

17. Judgments were recovered on the several bonds, and decrees of foreclosure rendered on the several mortgages, in the Court of Common Pleas for Richland County, at the May Term, 1876; and in pursuance of said judgments and decrees, the several mortgaged premises were advertised for sale on the sales day in December then next ensuing.

18. On the 28th day of November, 1876, after said advertisement and before the day of sale, the complaint in the present action was filed, and thereupon an order for temporary injunction was granted.

I find, as conclusions of law—

1. That Campbell R. Bryce took an estate in fee conditional in the lands devised to him by the will of John Bryce, and, of consequence, an absolute estate in the personalty bequeathed in the same language; and that the supposed evidences of indebtedness set forth in the complaint are absolutely null and void.

2. That the several mortgages executed by the said Sarah M. Bryce was such a *bona fide* alienation of the lands held by her as devisee under the will of the said Campbell R. Bryce, within the purview of the Statute of 3 and 4 W. and M., Ch. XIV, (2 Stats., 534,) as to render the same not liable to execution issued upon any judgment recovered against the said Sarah M. Bryce.

It is, therefore, ordered, adjudged and decreed that the injunction be dissolved, that the complaint be dismissed, and that the costs and disbursements of the defendants, Jesse E. Dent, "The Mechanics' and Farmers' Building and Loan Association of Richland County, South Carolina," and George W. Williams, be paid by the plaintiffs and defendant, Sarah M. Bryce.

The plaintiffs appealed on the following grounds:

I. That the mortgages referred to in the pleadings herein are not an "alienation," within the meaning of Act of 3 and 4 W. and M., Chapter XIV, (2 Stat. at Large, 534,) when it is respectfully submitted that this Act has no application to this case at all.

II. That His Honor erred in construing the will of John Bryce, deceased; especially so when it is held that C. R. Bryce took an absolute estate in all the personal property of said John Bryce.

*Arthur & Arthur, Boone,* for appellants.

*Clark, Sloan, Fickling,* contra.

November —, 1878. The opinion of the Court was delivered by

McIVER, A. J. The first question in this case arises upon the construction of a clause in the will of John Bryce, who died 24th November, 1855, which is in the following words: "To my son. Campbell R. Bryce (with the above requisitions and reservations) and to his children, the lawful heirs of his body, I give and bequeath all the rest and residue of my estate, real and personal, of whatever kind I may die seized and possessed of, or that may at any time hereafter, either before or after my death, become mine, to him and to his children forever. And I wish it understood and declared that, having already given him about sixty thousand dollars at various times, and he being worth a property of his own at the present of fully that amount, clear of debt, that, in the event of his dying leaving a wife, his widow shall not be entitled to any part or portion of my estate which I am now disposing of, but that it shall be the property of all his children, share and share alike, to be enjoyed and managed and controlled by him during his lifetime for his and their use and benefit; and this is not intended to apply to the present wife only, who is a most excellent lady and faithful and loving wife and mother, but also to any future wife. And, furthermore, I intend and devise, that, in the event of his outliving his children and dying childless, without grandchildren, the lawful issue of his loins, then the estate which I now have shall go to the children of my brothers, Peter and Robert Bryce, and their children."

The controlling rule in the construction of a will is the *intention* of the testator. Hence, if we can discover from the language of the testator what his intention was, we must construe the will in accordance with such intention, provided the same is not in violation of law. It seems to us, from the language of this clause, that the primary object of the testator's bounty was his son, Campbell R. Bryce, and after him his children and grandchildren; and in the event there were none such at the death of his son, then the children of testator's two brothers, Peter and Robert. It is not so manifest, however, as to what was the nature of the estates which he intended these objects of his bounty to take. It is only necessary for us to determine in this case the nature of the son's estate. Reading the

whole clause together, with a view to give effect to every part of it, if possible, as required by one of the fundamental rules in the construction of wills, we cannot reach the conclusion that the testator intended that his son should take an absolute estate in fee simple, but, on the contrary, it appears to us that the intention was that the son should take a life estate, with remainder to his children and their children. If his purpose was to give the son an absolute estate, there was no necessity to insert the words "and to his children, the lawful heirs of his body;" and these words would, therefore, be given no force or effect whatsoever, and may as well have been omitted. To construe the will as giving an absolute estate to the son would be practically ignoring that portion of the will containing the words above quoted. Again, if he should be regarded as intending an absolute estate to the son, what possible force and effect could be given to the words " that in the event of his dying leaving a wife, his widow shall not be entitled to any part or portion of my estate which I am now disposing of, but that it shall be the property of all his children, share and share alike, to be enjoyed and managed and controlled by him, *during his lifetime,* for his and their use and benefit"? Now, these words would not only not be given any force or effect if the will should be construed as conferring an absolute estate upon the son, but such a construction would be a direct contradiction, and defeat the testator's express wish, in one respect at least; for it is perfectly manifest that his intention was to exclude the widow of his son, for reasons entirely consistent with respect for the lady, which he has taken particular pains to explain, from any participation in the bounty provided for his son, and this it would be impossible to do if the will is construed as conferring an absolute estate upon the son; for if the son took such an estate, then, necessarily, upon his death intestate his widow would inherit her portion under the Statute of Distributions, and if he left a will there would be nothing to prevent the son, if he held the absolute estate, from giving the whole or any part of it to her; so that, in either case, the intention of the testator would not be carried out, but, on the contrary, would be defeated and directly contradicted.

Again, the language of the testator, speaking of his son, "that, in the event of his outliving his children and dying childless, without grandchildren, the lawful issue of his loins, then the estate which I now have shall go to the children of my brothers, Peter

and Robert Bryce, and their children," is wholly inconsistent with the idea that the testator intended to give his son an absolute estate, and, on the contrary, indicates an intention that the estate of the son was to terminate with his life. We are, therefore, of opinion that the testator did not intend to give his son an absolute estate, but only a life estate, with remainder to his children or grand-children, and, in the event of his dying without leaving issue, either of the first or second generation, then with remainder to the children of his brothers. It is not enough, however, to ascertain that such was the intention of the testator, but we must go on and inquire whether such intention can be carried into effect consistently with established principles of law. If the language be construed as amounting to a devise to the son and his children, and, in case he should die without either a child or grandchild, then over to the children of the brothers of testator, as we think it may well be, and if the term children be regarded as synonymous with "heirs of the body," which is the sense in which the testator seems to have used the word children, as is evidenced by the language "to his children, the lawful heirs of his body," and which is the sense most favorable to the view presented by the respondents, then, prior to the Act of 1853, (12 Stat., 298; Gen. Stat., Chap. 86, § 10, p. 443,) there might have been a question whether the limitation over was not void for remoteness, and whether the son did not take a fee conditional estate in the realty and an absolute estate in the personalty. But since that Act, which was passed prior to the death of the testator, no such question could arise. That Act declares "that whenever * * * in any will of a testator hereafter dying, an estate, either in real or personal property, shall be limited to take effect on the death of any person without heirs of the body or issue, or issue of the body, or other equivalent words, such words shall not be construed to mean an indefinite failure of issue, but a failure at the time of the death of such person." Hence, in construing a will which took effect after the passage of that Act, we are required to read a devise to one and the heirs of his body, or to one and his issue, and, in case of his death without heirs of his body or without issue, then over to some one else; as if the gift were to one and the heirs of his body, or to one and his issue, and, in case of his death without *leaving* heirs of his body or without *leaving issue living at the time of his death*, then over, in which case the limitation over would unquestionably be good. Reading, then, this will in that

way, we should have a devise to Campbell R. Bryce and the heirs of his body, and, in case he died without leaving such heirs living at the time of his death, then over to the children of testator's brothers. These are, in effect, the same words as those used in Bell's will, and, according to the case of *Henry* vs. *Archer*, (Bail. Eq., *535,) the authority of which has never, so far as we are informed, been questioned, but which, on the contrary, has been so repeatedly recognized in a number of subsequent cases, (which are appended in a note to that case, as reported in the second edition of Bailey's Equity Reports,) that, as Dunkin, Ch., says in *Hay* vs. *Hay*, (4 Rich. Eq., 387,) "it may now well be regarded as a rule of property." These words, when applied to personalty, create an estate for life in the first taker, with remainder to his issue as purchasers. In the case of *Henry* vs. *Archer*, the bequest was to testator's daughter Elizabeth, "to her and the lawful issue of her body forever;" and after various other devises and bequests, the testator proceeds : "And it is my will and desire that if any of my sons or daughters should die without leaving lawful issue of their bodies alive, then their part of the estate to be equally divided amongst my then surviving children." The contest was between the children of Elizabeth, who was dead, and certain creditors of her husband, who claimed that Elizabeth took an absolute estate and that her husband's marital rights had attached, he having been in possession during the coverture, and the Court of Appeals in equity held, in conformity with a previous decision of the Court of Appeals in law, in the case of *Henry* vs. *Means*, (2 Hill, 328,) that Elizabeth took only a life estate in the personalty, with remainder to her children, upon the principle that where there is an express gift to issue generally, a limitation over, in the event of the first taker dying without leaving issue living at his death, will confine the gift to such issue as are living at that time and entitle them to take as purchasers. The case under consideration comes within this principle, and we are unable to distinguish it from the case of *Henry* vs. *Archer*. In our opinion, therefore, Campbell R. Bryce took, under the will of his father, an estate for life in the personalty, with a valid remainder to such of his children or heirs of his body as were living at the time of his death. This being the case, the memoranda of indebtedness, in the form of notes given by Campbell R. Bryce to the estate of John Bryce, so far as they represent personal property, constitute valid claims against his estate in behalf of his

children; but as he was entitled to a life estate therein, such amounts will not bear interest except from the time of his death. So far as the two larger notes, so called, are concerned, they are admitted to be representatives of personal property—the proceeds of the sales of bank stock; but as to the one for two thousand dollars, it does not distinctly appear what it represents, except that it was money of the estate of John Bryce; but whether money arising from the sales of *real* estate, which Campbell R. Bryce was authorized by his father's will to make, or from the sales of *personal* property, or from what source it was derived, does not appear, and may, therefore, be a matter for further inquiry in the Court below.

It appears, however, that some of the children of Campbell R. Bryce released their claims against the estate of their father on account of two of the so-called notes, and, as the *bona fides* of that release has not been questioned, it must operate as a discharge so far as the interests of those who were of age at the time are concerned. Two of the parties who signed this release were not of age at the time it was signed, but attained the age of twenty-one years some time before the commencement of this action; and as the Circuit Judge has found that " the existence of the three notes and the release above recited was always known to the several members of the family of Campbell R. Bryce, deceased, and at no time before the commencement of this action was any claim to the said notes set up, or any objection to the said release urged, by any one of the parties," it may be that these two children will be held to have ratified the release, which they signed while minors after they had attained their majority. But as there is no decision upon this point by the Court and but little testimony, it will be necessary for that Court to make further inquiry as to this point. As to the two children who did not sign the release and who are not yet of age, it is manifest that their rights can in no wise be affected thereby.

The next inquiry is as to the effect of the several mortgages executed by Mrs. Sarah M. Bryce to some of the defendants. She was executrix as well as devisee under her husband's will, and the property mortgaged consisted of lands devised to her by him. The will of Campbell R. Bryce invests his executors, or a majority of such as may qualify, " with authority to sell or dispose of any portion of my estate, real and personal, they may deem expedient, at public or private sale, for change of investment, partition or any other purpose not inconsistent with my will." It seems that

all three of the executors named qualified, though one of them, Mrs. Sarah C. Bryce, died prior to the execution of the mortgages in question. These mortgages, however, do not purport to have been executed in pursuance of any power conferred by the will, even were it conceded that the terms of the will were sufficient to confer such a power; they were not given to secure debts due by Campbell R. Bryce, but, on the contrary, were given to secure the individual debts of Mrs. Sarah M. Bryce, and they were executed by her alone and not by the other surviving executor. It is clear, therefore, that these mortgages cannot be regarded as having been executed in pursuance of any power conferred upon his executors by the will of Campbell R. Bryce, but must be regarded as the individual act of Mrs. Bryce as devisee. Mrs. Bryce being both executrix and devisee, she cannot in the latter capacity claim any rights inconsistent with her duty in the former. Her first duty as executrix was to pay the debts of her testator so far as his property would extend, and until she had performed that duty it is difficult to understand how she could acquire any adverse rights to such property, which was in her hands, primarily, for the purpose of paying such debts. She must, therefore, be regarded as in possession as executrix until the debts are paid, and the lands devised to her must, while in her hands, remain liable for the payment of the debts due by her testator in preference to any debts due by her in her individual capacity.

This brings us to the question whether the mortgagees can claim the benefit of the Statute 3 and 4 W. and M., Chap. XIV, (2 Stat., 535; Gen. Stat., 92, § 5, p. 464); that is, whether a mortgage of real estate is an *alienation* within the meaning of that statute. It admits of no dispute that if the answer to this question depended alone upon the English cases it must be answered in the affirmative. These cases are the legitimate result of the nature of a mortgage at common law. A mortgage under that law is defined to be " the *conveyance* of an *estate*, by way of pledge, for the security of debt, and to become void upon payment of it."—1 Hilliard on Mortgages, Chap. I, § 2, following 4 Kent Comm., 133. Or, "a mortgage is a pledge and more, for it is an absolute pledge, to become an absolute interest if not redeemed at a certain time," following the definition in 1 Powell on Mortgages, 3–4. Hence it naturally followed, from the inherent qualities of a mortgage, that, as Nott, J., says, in *State* vs. *Laval*, (4 McC., 339–40,) " a mortgage,

according to the English law, is a *conveyance* of land as a security for money to be paid in future, and defeasible upon the payment of the money within the time prescribed. If the money be not paid according to the contract the deed becomes absolute and the fee of the land is vested in the mortgagee." This being so, the necessary result would be that a mortgage must be regarded as an alienation. It is very apparent, however, that our Act of 1791 (5 Stat., 169,) introduced not only important but radical changes in the very nature of a mortgage; in fact, we may say, not only revolutionizing but absolutely reversing the nature of a mortgage. For, while at common law it operated as a *conveyance* of an *estate*, by that statute it is expressly declared that it shall *not* so operate, " even after the time allotted for the payment of the money secured by the mortgage is elapsed." And while, as we have seen, by that law " a mortgage is a pledge *and more*, for it is an absolute pledge, to become an absolute interest if not redeemed at a certain time," by that statute it is expressly declared that it ought to be considered "*only* as a pledge;" and while at common law the mortgagee, upon breach of the condition, could maintain an action to recover the possession of the mortgaged premises, by that statute it is expressly declared that a mortgagee shall *not* be entitled to maintain such action except " when the mortgagor shall be out of possession." In the face of these radical changes in the nature and effect of a mortgage, made by statute, it is difficult to understand how a Court can now attribute to a mortgage qualities of which it has been deprived by legislative enactment; for it is essential to the idea of a mortgage being an *alienation* that it should be the *conveyance* of an *estate*, and that the statute expressly declares it shall *not* be. The word is never used, so far as we are informed, either by text writers or in adjudicated cases in any other sense. The essential feature of it is that it involves the idea of a transfer of the *title* to an estate by the act of the parties as contradistinguished from the operation of the law. The legal definition of the term is, the act by which the *title* to an *estate* is voluntarily resigned by one person and accepted by another in the forms prescribed by law.—2 Bouv., § 1992. It is true that we do find the expression " alienation by way of mortgage" both in the text books and reported cases, but it is applied to mortgages as they were at common law, and not to mortgages as changed by the Act of 1791; or, if so applied, incorrectly applied,—resulting, probably, from a habit which grew up

under the common law, just as we will presently find with regard to the words "equity of redemption." It is argued, however, that by the terms of the Act of 1791 the changes thereby introduced do not apply "when the mortgagor shall be out of possession," and therefore in such cases a mortgage still retains all of its common law incidents or qualities, amongst which is, that it is a *conveyance* of an estate, and, therefore, should be regarded as an *alienation.* A sufficient answer to this is, that we are not now dealing with such a case, and that it will be time enough to consider such a case when it arises. In the case in hand the mortgagor is still in possession, and therefore it does not come under the proviso to the second Section of the Act of 1791. It may be insisted, though, that as in the one case a mortgage must still be regarded as an alienation, that it ought also to be so considered in the other, probably, for the purpose of preserving the symmetry of the law. This is undoubtedly a good purpose; but however good it may be, we are unable to see by what authority a Court can abrogate a statute, or any part of it, even for the purpose of subserving so desirable an end. It is perfectly manifest that the Act of 1791, as it has been construed by our Courts with respect to the effect of that proviso, has established not only marked differences, but absolute contradictions, in the two cases; for where a mortgagor remained in possession, the mortgagee might, under certain specified circumstances, have applied to the Court of law for a sale, while in the other case, where the mortgagor was not in possession, he was not allowed, under any circumstances, to resort to what is called in one of the cases "the easier and cheaper mode" afforded by the Court of law, but was forced to take proceedings in the Court of Equity, which are denominated as "tedious and expensive." In the former case he could not maintain an action for possession of the mortgaged premises, while in the latter he could. In the one case the mortgage was to be regarded as *only* a pledge, while in the other it was a pledge and something more. And, finally, in the former case the mortgagor was still the owner of the land, even after breach of the condition, while in the latter he was not. We do not, therefore, see the force of the argument that, notwithstanding all these radical changes, we should still attribute to a mortgage in the one case a feature of which it was deprived by these alterations, simply because in the other case, to which these alterations do not apply, the mortgage might still retain all of its common law features. Whether the true construc-

tion has been placed upon the proviso to the second Section of the Act of 1791 we do not propose to inquire, inasmuch as it cannot affect the case under consideration, especially as that construction has been so long settled and has been followed in so many cases as to demand, probably, that it should not be disturbed, even though originally it may have been wrong. But we are not disposed to extend the effects of that construction beyond what the cases on the subject absolutely require.

Again, it may be argued that the provisions of the Act of 1791 are but the declaration of the construction which had always been placed upon the nature and effect of a mortgage by the Court of Equity, and that the legal estate was always regarded by that Court as remaining in the mortgagor. This is a common remark, and is to be met with in many of the cases; but, like most common remarks, it is true only in a modified sense. It is not true that the Court of Equity always regarded the mortgagor as the legal owner of the mortgaged land, for, if so, whence the necessity of a reconveyance when the mortgagor applied to that Court to redeem after condition broken? If the *legal title* was regarded by the Court of Equity as still in the mortgagor, as it is still declared to be by the Act of 1791, after condition broken, the reconveyance of the mortgagee would be worse than a nullity—it would be an absurdity. A person who had no title would be conveying to one who already had the title. Certainly a Court of equity would not decree that one should convey what he never had to another who already had the thing to be conveyed. And yet, as Wardlaw, J., says, in *Mitchell* vs. *Bogan*, (11 Rich., 697,) "the right to redeem, if opposed, always required the aid of a Court of equity for its enforcement, and was not complete in fruition until there had been a reconveyance from the owner of the legal estate"—the mortgagee. Even where the mortgage debt had been paid or extinguished, there must have been a reconveyance. As Lord Hardwicke said in *Harrison* vs. *Owen*, (1 Atk., 520,) "if a mortgagee cancels a mortgage and it is found so in his possession, it is as much a release as canceling a bond, but it does not convey or revest the estate in the mortgagor, for that must be done by some deed." This shows that the Court of Equity did not regard the mortgagor as the owner of the legal estate. It would probably be more correct to say that the Court of Equity always regarded the mortgagee as the owner of the *legal estate*, which, however, was im-

pressed with a trust to reconvey upon payment or tender of the mortgage debt; and this is a very different thing from the light in which the relations of the parties—mortgagor and mortgagee—are to be regarded under the provisions of the Act of 1791. In the one case, the mortgagor, upon payment or tender of the debt, might be forced to go into the Court of Equity to get back that—the legal title to the land—which he had *alienated;* while in the other, having never parted with such legal title, he is under no necessity to apply to apply to any Court to get that which he already had, having never alienated it.

Again, it may be urged that the provisions of the Act of 1797, (5 Stat., 311,) which was passed, as its title declares, " to explain and amend " the Act of 1791, show that the Legislature did not intend to effect the radical changes in the nature of a mortgage which we have indicated above as the necessary result of the Act of 1791 in those cases to which it applies. The Act of 1797 provides that, whereas, under the Act of 1791, "doubts have arisen whether a mortgagee, taking a release of the equity of redemption from his mortgagor, can be considered as legally and fully seized of the premises mortgaged, inasmuch as that Act discloses that the premises mortgaged are still to be the estate of the mortgagor, and only a pledge in the hands of the mortgagee, who is not thereby vested with any legal estate, and, therefore, cannot be benefited by such release:

" *Be it, therefore, enacted,* * * * * That all releases of the equity of redemption made since the passing of the said Act, or hereafter to be made, shall have the same force and effect in law as if the said Act had not been passed."

From this it may be argued that the design of the Act of 1791, as thus explained and amended, was not to change the previously existing law in respect to who should hold the legal estate,—whether mortgagor or mortgagee,—inasmuch as the Act of 1797 provided that a mere release of the equity of redemption should be sufficient to perfect the title in the mortgagee, and that this necessarily involved the idea that, notwithstanding the express declaration of the Act of 1791 to the contrary, the mortgage did convey the *legal estate* to the mortgagee, which was a perfect title, subject only to the trust, which equity impressed upon it in favor of the mortgagor, to reconvey upon payment of the mortgage debt; and, therefore, when that equity was gone, by the release of what was called the

equity of redemption, the title of the mortgagee was absolutely perfected. This argument, though plausible and ingenious, is answered conclusively by the remark that it results necessarily in the repeal or abrogation of that portion of the Act of 1791 which expressly declares that, even after condition broken, "the mortgagor shall be deemed the owner of the land;" and as there are no repealing words in the Act of 1797, and no such effect has been attributed to it in any case that we are aware of, but, on the contrary, the full force of the Act of 1791 has been repeatedly recognized by our Courts, we must necessarily seek for some other construction of the Act of 1797. The most obvious one is that it was not designed to repeal any portion of the Act of 1791, but simply to give additional force and effect to a release of the equity of redemption—make it operate as a conveyance. Indeed, since the passage of the Act of 1791, the term "equity of redemption" is, as Nott, J., says in *State* vs. *Laval*, (4 McC., 340,) "clearly a misnomer," as is fully shown by Wardlaw, J., in *Mitchell* vs. *Bogan*, (11 Rich., 704). In speaking of the Act of 1791, he says: "There can be under the Act no redemption before sale for satisfaction, for no estate to be redeemed has passed from the mortgagor or those who hold under him until a sale which bars their title. What is generally called the equity of redemption is a *legal* right in the owner of the land to disencumber it. * * * There can be no simple foreclosure; for if all right to disencumber was taken away and nothing more done, there would still be no estate in the mortgagee. The release of the equity of redemption is a *conveyance* of the land to him who has the encumbrance."

Again, it is obvious that the words "equity of redemption" do not mean what the words would naturally import, for it is beyond dispute that the interest which is commonly called the equity of redemption is liable to levy and sale under an execution; and it is equally clear that if it were, what the words import, a mere equity, it would not be liable to levy and sale under an execution. It is plain, therefore, that what is miscalled the equity of redemption is, in fact, the legal estate in the land, subject to the encumbrance created by the mortgage, and that the release of the equity of redemption must be regarded, as Judge Wardlaw says, as the conveyance of the land to him who holds the encumbrance.

We do not think that this question is concluded by the decision in *Haynesworth* vs. *Bischoff*, 6 S. C., 157. The point decided there

is, that a mortgagee may claim the protection afforded to purchasers for valuable consideration without notice, upon the equitable principles regulating the doctrine. The case does not decide that a mortgage is an alienation in the proper sense of that term. As the present Chief Justice well says in that case: "The equitable doctrine as to purchasers springs out of the peculiar nature of equity as the administration of a settled rule of conscience. When it is sought to affect a party or subject his rights or estate to some equity or state of equities existing primarily between other parties, on the ground that he has acquired some property or right from one bound by such equity, and in whose hands the property or right previous to its transfer was specifically bound by such equity, it is necessary to show that the act of acquiring such property or right ought not in conscience to stand. If the dealing has been fair and the purchaser has been at cost to acquire the property or right, not intending or knowing of any injury to result therefrom to a third person, it is clear that a Court that proceeds on the ground of conscience cannot interfere with rights thus obtained."

But in this case the mortgagees do not and could not invoke any such equitable doctrine, but rely upon the express provisions of a special statute, and by that statute must they stand or fall. The claim which they resist does not rest upon a mere equity, as in *Haynesworth* vs. *Bischoff*, but is a plain legal right—lands in the possession of an heir or devisee being liable at law for the debts of the ancestor or testator. Therefore the question here is not whether the mortgagees can claim the protection afforded purchasers for valuable consideration without notice, upon the equitable principles regulating that doctrine, but the only question is, whether a mortgage of real estate can be regarded as an *alienation* within the meaning of that term as used in the Statute of William and Mary.

It is argued, however, that the words used in that statute are "*sold, aliened or made over,*" and not merely the word aliened, and that this shows a purpose to include something more than mere alienation, in the strict sense of that term, as those words will include any disposition of the property whereby the rights of third persons are affected. This argument is not sustained by the facts, for in that part of the statute which saves the rights of purchasers— the only part with which we are concerned—the only word used is the word aliened. In the previous part of the Section fixing the liability of the heir or devisee, as the case may be, the three terms,

sold, aliened and made over, are used, but not in that part which saves the rights of purchasers. Hence, if there is any force in this argument at all, it is rather against than in favor of the view contended for by the respondents. For if it be argued that the Legislature, by using the three terms, designed to cover other cases than those strictly within the meaning of the term aliened, then the fact that the additional terms were dropped when they came to provide for the rights of purchasers would seem to indicate that they intended to save the rights of purchasers only in the case of alienation, in the strict sense of that term.

Finally, it is argued that as a mortgage was undoubtedly an alienation at the time of the adoption of the Statute of W. and M., (1712) that statute ought now, notwithstanding the subsequent changes in the nature of a mortgage, still to be construed as embracing a mortgage. There might be some force in this argument but for the fact that this statute has been re-enacted in the general statutes, and the same terms, so far as the question under consideration is concerned, are retained, although the phraseology in other respects is changed, as we know has been the case throughout the general statutes, in order to make them conform to existing laws. For example, in this very statute, from that part of it which makes the heir answerable, the words "in an action or actions of debt" are omitted, because the Code of Procedure had abolished all distinctions in the forms of actions.

It follows, therefore, from these views that the children of Campbell R. Bryce, who have not debarred themselves by the release above mentioned, have a right to subject the lands of their father in the possession of his devisee to the payment of any claims which they may be able to establish against him, notwithstanding the fact that the devisee has mortgaged the same to secure the payment of debts contracted by her. The question of the Statute of Limitations was not passed upon by the Circuit Court, and therefore is not properly before us.

The judgment of the Circuit Court is reversed and the case remanded to that Court for such further proceedings as may be necessary and proper.

*Willard,* C. J., and *Haskell,* A. J., concurred.